# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIRACLE TEMPLE CHRISTIAN ACADEMY | : : : | |
| | : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | |
| CHURCH MUTUAL INSURANCE COMPANY | : : : | NO. 12-0995 |
| Defendant. | : : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                                                                                    March 5, 2013

Currently pending before the Court is Defendant Church Mutual Insurance Company's Motion for Summary Judgment. For the following reasons, the Motion is denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This action arises from Plaintiff Miracle Temple Christian Academy's ("Miracle Temple) attempt to recover losses sustained on its property. At issue is whether or not this damage was covered by the insurance policy provided by Defendant Church Mutual Insurance Company ("Church Mutual").

Specifically, was the damage to buildings on Miracle Temple's property[1] the result of wind and water from a storm on March 18, 2010 or the result of normal wear and tear or negligence on behalf of Miracle Temple. (Compl. ¶ 6.) The provisions of the insurance policy at issue state the following:

---

[1] The buildings include a church, a rectory, two one-car garages, a convent, an academy/school, a banquet hall, and a playground storage structure. (Def.'s Mot. Summ. J., Ex. K, Feb. 28, 2011 Report of Russel Daniels.)

> We will not pay for loss or damage caused by or resulting from any of the following . . .
>
>     d.    (1)    wear and tear;
>           (2)    rust, or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself; . . .
>
>     f.    continuous or repeated seepage or leakage of water, or the presence or condensation of humidity moisture or vapor that occurs over a period of 14 days or more . . .
>
>     l.    neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss

(Def.'s Mot. Summ. J., Ex. I, Insurance Policy.)

Six months after the March storm, on September 29, 2010, Miracle Temple retained Metro Public Adjustment to handle the claim. (Req. for Admission 3.) Miracle Temple informed Church Mutual of the alleged damage and loss on November 9, 2010. (Req. for Admission 4.) Miracle Temple and/or Metro Public Adjustment hired Pennypack Contractors to repair the roofs on Miracle Temple's buildings, which Pennypack did in November of 2010. (Req. for Admission 5.) Prior to the repairs (though it is unclear at exactly what time), photographs were taken of the damage which depicted open seams in the roof coverings and flashings. (Req. for Admission 9.) The photographs do not depict wind damage. (Req. for Admission 10.)

On February 11, 2011, Russel Daniels of Paul Zamrowski Associates inspected seven buildings on the property. (Def. Mot. Summ. J., Ex. K, Feb. 28, 2011 Report of Russel E. Daniels ("Daniels Report").) Mr. Daniels's report stated that, except for one classroom in the school building where a roof patch was blown off, the cause of damage to the church property was not

from the storm but from long term deterioration and inadequate installation of the roof and flashing. Id.

On March 16, 2011, Kurt Klein of Professional Insurance Adjustment notified Metro Public Adjustment that Church Mutual would provide coverage only for the damage to the roof of the school building, water damage to one second floor classroom, the roof of a playground building, and the capping/second floor porch of the convent building. (Req. for Admission 12.) On March 30, 2011, Mr. Klein sent the Daniels Report, Church Mutual's Statement of Loss, and a Sworn Statement in Proof of Loss to Metro Public Adjustment for Miracle Temple's signature (Req. for Admission 13.) Upon receiving this information, Metro's representative, Joe Mellesky, advised Mr. Klein that he disagreed with the findings in the Daniels report, and that Miracle Temple was considering hiring counsel and taking legal action. (Req. for Admission 14.) Mr. Klein responded to Mr. Mellensky and told him to send him Miracle Temple's engineer's report and that Church Mutual would be open to readjusting the loss. (Req. for Admission 15.) Church Mutual claims that this engineer's report was never sent. (Def.'s Mot. Summ. J. ¶ 33.)

On April 18, 2011, Mr. Klein sent Metro Public Adjustment a revised Statement of Loss and revised proof of loss for Miracle Temple's signature. (Req. for Admission 16.) In June of 2011, Miracle Temple agreed to accept payment for the "undisputed" loss of $28,065.50 minus a $1,000 deductible. (Req. for Admission 17.) A check for $27,065.50 was issued on June 15, 2011 and cashed by Miracle Temple. (Req. for Admission 18, 20.) On January 24, 2012 the instant case was filed by Miracle Temple regarding the remaining disputed loss.

On October 3, 2012, Daniel M. Honig inspected the property on behalf of Plaintiff "to review recent roof damage and related interior water damage." (Def.'s Mot. Summ. J. Ex. L, Nov.

3

9, 2012 Daniel Honig Report ("Honig Report").) In his expert report, Mr. Honig disagreed with many of the conclusions in the Daniels Report, and noted that he believed damage to the Church, rectory, and banquet hall were caused by wind and rain. (Id.) He agreed with the conclusion in the Daniels Report that the roof on the garages and the playground storage structure had reached the ends of their respective lifespans and required replacement. (Id.)

As noted above, Miracle Temple filed suit on January 24, 2012 in the Philadelphia County Court of Common Pleas bringing claims for (1) breach of contract, (2) bad faith, and (3) common law fraud. The case was removed to this Court on February 24, 2012. After a Motion to Dismiss was filed by Church Mutual, the bad faith and fraud claims were dismissed. Church Mutual filed the current Motion for Summary Judgment on January 17, 2013. Miracle Temple filed a Response in Opposition on February 1, and Church Mutual filed a Reply Brief on February 12. The Court will now consider the merits of the Motion.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed

evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate

to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III. DISCUSSION

Church Mutual contends it is entitled to summary judgment because Miracle Temple has failed to meet its burden of setting forth evidence of property damage beyond that for which it has already paid and which is covered by the normal wear and tear provision of the policy. Miracle Temple contends that the Honig report is sufficient to, at the least, create a material issue of fact about the extent of damage sustained on the property. Thus, the instant Motion turns on the Honig Report's sufficiency.

The Supreme Court has explained that district court judges perform a "gatekeeping role" with respect to expert testimony by assessing whether such testimony is admissible under Federal Rule of Evidence 702. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590-91, 597 (1993); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 146-47 (1999) (extending Daubert to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. When the expert testimony at issue is not scientific, "the court must determine whether the expert is qualified to provide such an opinion, whether the testimony assists the fact-finder, whether the testimony is reliable and whether the testimony 'fits' the facts of the case." D

& D Assoc., Inc. v. Bd. of Educ. of N. Plainfield, 411 F. Supp. 2d 483, 487-88 (D.N.J. 2006), aff'd, 2006 WL 755984 (D.N.J. Mar. 20, 2006).

The first requirement of qualification is interpreted liberally to encompass "a broad range of knowledge, skills, and training." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). At minimum, the expert "must possess skill or knowledge greater than the average layman." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (quotations omitted). The second factor of reliability "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589–90). Finally, the requirement of "fit" concerns relevancy. "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" In re Unisys Savings Plan Litig., 173 F.3d 145, 162 (3d Cir. 1999) (quoting Daubert, 509 U.S. at 591).

Church Mutual claims that the Honig report is unreliable and that Mr. Honig does not have "good grounds" for his belief. In support of this contention, Church Mutual contends that (1) Mr. Honig did not investigate the property until two and a half years after the storm, (2) Mr. Honig did not have access to the roofs during his visit, (3) Mr. Honig states that, by the time of his visit, the damage to the exposed roofing surfaces on some of the buildings had already been repaired, and (4) Mr. Honig's conclusions are "equivocal" and do not identify specific wind and water damage to the roofs or exterior of the buildings.

Upon examination of the Honig report, the Court believes it is based upon sufficient factual evidence and can be placed before a jury. Though an examination closer to the date of the storm would have certainly been preferable, Mr. Honig's report does acknowledge that his conclusions

are based on the state the property was in when he arrived.  He takes into account, for example, the repairs that were already completed on the roof of the convent.  (Honig Report 6.)  He also agrees with Mr. Daniels's conclusions that the roofs on the two garages and the playground storage area showed cumulative water damage occurring over a long period of time and had already reached the end of their usual lifespan.  (Id. at 4, 6.)  Moreover, even though Mr. Honig's examination took place over two and a half years after the March 13 storm, he was able to view pictures of the property taken prior to the roof being repaired and closer to the date of the storm.  (Id. at 1 (indicating materials consulted in his review).)  Similarly, though Mr. Honig did not have access to the roofs, he contends he did not need such access in order to make his determinations on the damage sustained to the property.  (Id. at 2.)  Mr. Honig was also able to reach his conclusions based on pictures of the property that existed before the roofs on the buildings were repaired.  Finally, it is the Court's conclusion that his conclusions are specific enough that, in combination with the other evidence presented, the jury could find that there was additional damage to Miracle Temple's property that is not excluded by the normal wear and tear provision of the policy.[2]

In short, though the circumstances under which Mr. Honig conducted his investigation were far from ideal, these shortcomings do not preclude his investigation from being based on adequate

---

[2]As an example of such detail, in disagreeing with Mr. Daniels' conclusion over the damage to the Church being caused by "roof valleys," Mr. Honig notes:
> [T]he valleys above the sanctuary damage areas are not protected from the south given their configuration and proximity to the gable end wall.  The damage occurred approximately below the interface of the main gable roof of the building and a lower gable roof above the southern altar area, with a southern-facing gable wall elevation at the interface.  The valleys to which Mr. Daniels refers are at the edges of two gable dormers adjacent to the southern end of the roof.  Therefore, the valleys are not fully and directly protected, thereby actually increasing the likelihood of damage from wind-driven rain if the wind direction is to the north.

(Honig Report 2–3.)

facts or data. As to the different conclusions he reached from Mr. Daniels, Church Mutual is free to highlight for the jury the extenuating circumstances that make Honig's report less than ideal.

## IV. CONCLUSION

In light of the foregoing, Church Mutual's Motion for Summary Judgment is denied. Competing expert testimony creates a material issue of fact on the amount of damage to Miracle Temple's property and whether or not it is covered under the normal wear and tear exclusion of the insurance policy. Despite the questionable circumstances surrounding Daniel Honig's expert report, it is sufficient to meet the Daubert standard and be presented to a jury.

An appropriate Order follows.